**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMMY LOUISE ORTA,<br><br>               Plaintiff,<br><br>     v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>               Defendant. | Case No. 1:12-CV-00837-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff Tammy Louise Orta ("Plaintiff"), by attorney Steven G. Rosales, seeks review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act. The Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record and based upon proper legal standards, and affirms.

**I.**    **Procedural History**

Plaintiff filed her present applications in April 2009, claiming disability as of March 2007 (for SSI) and December 2004 (for DIB). AR 171, 178. DIB is paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. § 401 *et seq*. SSI is paid to disabled persons with low income. 42 U.S.C. § 1382 *et seq*. Only DIB is paid retroactively, up to twelve months from the application date. 20 C.F.R. §§ 404.621(a)(1), 416.335.[1]

---

[1] Where the applicable DIB and SSI regulations are virtually identical, this opinion will identify only one of these.

1

However, this is not Plaintiff's first time applying for benefits, a fact not addressed by the parties or the ALJ. Her previous application was made in March 2005 and denied in August 2005. AR 182, 202. This prior denial, even when made at the initial determination stage, is *res judicata* through August 2005. *See Taylor v. Heckler*, 765 F.2d 872, 876–77 (9th Cir.1985). Less clear is whether this initial determination also created a "presumption of continuing nondisability." *See Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir.1988); Social Security Acquiescence Ruling 97–4(9). Although this presumption appears to arise only from decisions made after an ALJ hearing, the issue is unsettled. *See Bennett v. Astrue*, 2013 WL 503933 (W.D. Wash. Jan. 18, 2013). Here, because the ALJ properly found Plaintiff to be not disabled, the Court need not resolve this issue.

Plaintiff's applications were denied initially and on redetermination. After a hearing on April 26, 2011, ALJ Christopher Larsen denied her applications in a decision dated May 13, 2011. The Appeals Council denied review on January 18, 2012. Plaintiff filed her complaint with this Court on May 22, 2012. *See* 42 USC § 405. The parties consented to magistrate jurisdiction and have submitted their cross-briefs without oral argument.

**II.     Scope of Review**

Congress has provided a limited scope of review of a decision to deny benefits. First, this Court reviews only the Commissioner's "final decision." 42 U.S.C. § 405(g). Here, because the Appeals Council denied review, that is the ALJ's decision. *Sims v. Apfel*, 530 U.S. 103, 106 (2000); *cf. Brewes v. Comm'r*, 682 F.3d 1157, 1161-62 (9th Cir. 2012) (describing limited consideration of Appeals Council's decision "as a practical matter"). Furthermore, this Court reviews only whether this decision applied proper legal standards and made findings supported by substantial evidence. *Bray v. Comm'r*, 554 F.3d 1219, 1222 (9th Cir. 2009). Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. Where the record as a whole can support either grant or denial, the Court may not substitute its judgment. *Id*.

## III. Evidence of Record[2]

### Plaintiff's Testimony

Plaintiff was born on April 10, 1972 and was 39 years old on the date of the hearing. AR 41. At the hearing in April 2011, Plaintiff described her mental health conditions to the ALJ. She said she had "visual, auditory, and motoral hallucinations continually, every day." AR 44. She also had "delusions at times," though not "often." AR 44. She also described a "mood disorder where I become very depressed," making her "very needful to be by myself," which can entail going into her room or getting on a bike and riding. AR 45.

She said that if she had a job, the need to be by herself would suddenly overcome her during the job. AR 46. She said that this disorder became more "set into my life" when she was working at Wal-Mart, in 2004. AR 46. At that time, she was working as a cashier, but she would sometimes ask to go pull in carts from the parking lot. AR 43, 46. At the time of the hearing, the duration of these feelings could vary; they might last, for example, five minutes, two hours, or "all day." AR 49. The duration would "usually" be in the range from "two to three to four hours." AR 50.

For her hallucinations, Plaintiff was prescribed Abilify, and she took this "once or twice." AR 50. She was reluctant to take the medicine because she felt that with her disorder, it was "too scary to not have a clear mind," and she felt that the person prescribing the medicine did not appreciate these concerns. AR 50-51. When she did take the medicine, she felt that it did alter her mind, in that it made her "very tired ... to where I could not ignore the things that I was hearing and seeing and feeling and thinking [and] ... not believe it." AR 52.

She acknowledged that she stopped going to mental health appointments "for a while out of discouragement from them being upset with me that I could not attend appointments." AR 52.

### Medical Record

Mary K. McDonald, Ph.D., performed a psychological evaluation of Plaintiff on July 11, 2005. AR 283-90. Plaintiff had a history of drug abuse involving methamphetamine and other drugs. While Plaintiff tested as "borderline" on an intelligence test, Dr. McDonald opined that this

---

[2] The Court has reviewed the entire record. However, because Plaintiff raises a single argument related to failure to consider the opinion of a medical expert, this summary will emphasize that issue.

3

was most likely an underestimate of her ability, possibly due to putting forth "less effort than would be expected." AR 284. She noted that Plaintiff's score on the Miller Forensic Assessment of Symptoms was "far above the level required to question if an individual is malingering or exaggerating their difficulties." AR 285. "She endorsed numerous items that included rare occurrences, being easily suggestible, usual experiences and highly unusual hallucinations. This would certainly lead one to question whether she is being truthful and cooperative with this evaluation." AR 285. Dr. McDonald diagnosed Rule Out Malingering; Amphetamine Abuse; Rule Out Poly Substance Abuse; Personality Disorder Not Otherwise Specified; Psychosocial Stressors Deferred; GAF Deferred. She opined that Plaintiff was "capable of simple repetitive routine employment."

Plaintiff received treatment at Tulare County Mental Health (TCMH) beginning in January 2005 and continuing through July 2005. She was discharged from treatment when she did not return for her group sessions. She was hospitalized under California Welfare and Institutions Code section 5150 in June 2007. She was admitted with an altered mental status. A toxicology panel was positive for cannabis.

Plaintiff was treated again at TCMH in April 2009. She described hearing voices that got worse when she stopped using drugs. Drug usage included methamphetamine and cocaine with a history of marijuana and LSD, but she tested negative for all illicit drugs. She was diagnosed with a psychotic disorder, a mood disorder, a personality disorder, and substance abuse. She attended group and individual therapy during 2009, but failed to keep many group appointments, especially after September 2009. During this period she repeatedly asked for letters recommending her for disability benefits, requests which her therapists consistently denied. AR 326, 337, 401.

Plaintiff last attended TCMH in February 2010. At that time, she appeared guarded and confrontational. She expressed an interest in changing therapists and expressed her frustration with the psychiatrist for giving her medication that could harm her liver. She became angry when asked what the voices say to her and did not answer the question. She agreed she had trouble getting along with others because of her "strong personality." She agreed to psychological testing. However, she never returned for the psychological testing and stopped attending her regular

sessions. She was discharged from the program in June 2010, for failure to participate. At that time, Dr. Shalts noted Plaintiff was misdiagnosed with a schizoaffective disorder and should be re-evaluated if she returned.

Consultative psychologist Greg Hirokawa, Ph.D., performed a psychological evaluation of Plaintiff in September 2009. AR 414-18. He diagnosed a depressive disorder, generalized anxiety disorder, polysubstance abuse dependence, personality disorder, and low average intellectual functioning. AR 418. He reported that the validity scales suggested an exaggeration of symptoms with significant elevation on the Hysteria scale and on the F scale, which measures items frequently not endorsed. AR 418. Dr. Hirokawa assessed a Global Assessment of Functioning (GAF) score of 58. AR 418.

On October 29, 2009, Kim Morris, Psy.D., a non-examining state expert, completed a Psychiatric Review Technique form. AR 423-33. Dr. Morris began with the following diagnoses, which she attributed to Dr. Hirokawa (AR 433):

- 12.02, Organic Mental Disorders (Dr. Morris diagnosed "borderline intellectual functioning");
- 12.03, Schizophrenic, Paranoid and Other Psychotic Disorders ("psychotic [disorder not otherwise specified]");
- 12.04, Affective Disorders ("Mood [disorder not otherwise specified]")
- 12.08, Personality Disorders ("Personality [disorder not otherwise specified]")
- 12.09, Substance Addiction Disorders ("Polysubstance Dependence – Reported to be in Full Sustained Remission; Caffeine Abuse – Continuous")

Dr. Morris then determined that Plaintiff did not meet or equal any listing: she was only mildly impaired in activities of daily living; moderately impaired in terms of difficulties in maintaining social function and in maintaining concentration, persistence, or pace; and without any repeated extended episodes of decompensation. AR 432.

In finding that Plaintiff did not meet a listing, Dr. Morris also cited her separate Mental Residual Functional Capacity (MRFC) assessment of Plaintiff. AR 434-36. This form begins with a series of checkboxes which are identified as "Summary Conclusions." Nine out of twenty of these items had a score of 2 out of 5 ("moderately limited"). The MRFC form ends with a section identified as "Functional Capacity Assessment" which instructs the author to "explain" these "summary conclusions in narrative form." AR 436. Here Dr. Morris wrote that Plaintiff could

5

understand, remember, and complete simple instructions and respond appropriately to supervisors; she could maintain appropriate behavior "in a context of limited public contact;" she could follow directions once a task is learned and maintain concentration, persistence, or pace to complete a workday and workweek; and she could sufficiently adapt to workplace hazards and routines. *Id*.

Dr. Morris concluded the Psychiatric Review Technique Form as follows: "In conclusion, [claimant] is capable of completing simple tasks with a moderate limitation in adaptation. It appears she would do best in a position that involved limited public interaction." AR 433.

**Testimony of Vocational Expert**

At the hearing, Linda Ferra, a vocational expert, described how various mental and physical limitations would impact Plaintiff's ability to work. *See* 20 C.F.R. §404.1560. First, she considered whether a person with these limitations and with Plaintiff's work experience could return to that past work. If not, she further considered whether that person, given Plaintiff's age and education, could adjust to new work. In making this analysis, she characterized Plaintiff's past work as "cashier" (unskilled, light—medium as performed) and "fast food worker" (unskilled, light).[3]

The parties asked Ms. Ferra to consider two hypothetical sets of limitations. In the first hypothetical, the person "can perform simple, repetitive tasks but without public contact." AR 57. Ms. Ferra stated that this person could not perform Plaintiff's past work, but she could do other work such as packing line worker (unskilled, light); assembler (unskilled, light); and farm worker (unskilled, medium). These represented 74,000 jobs in California and 740,000 nationwide.

In the second hypothetical, the person "cannot maintain regular attendance in the workplace and cannot maintain attention and concentration throughout an eight-hour day." AR 58. Ms. Ferra stated that this person could not do any work.

**IV.    Disability Standard**

To be disabled, a claimant must have impairments which foreclose all meaningful employment for at least twelve months. 42 U.S.C. § 1382c(a)(3). To make the disability

---

[3] In the parenthetical, the strength rating captures how much exertion the job requires and whether this is occasional (up to a third of a day), frequent (two thirds), or constant. The Specific Vocational Preparation ranks how long it takes to learn the job. Dictionary of Occupational Titles (4th ed.1991) Appendix C.

determination more uniform and efficient, ALJs follow a five-step "sequential evaluation process," stopping once they reach a dispositive finding. 20 C.F.R. §§ 404.1520, 1594(b)(5).

The sequential process begins with a "*de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996). At steps one and two, the claimant must verify that she is not meaningfully employed and in fact has severe impairments. Once a claimant passes this screening, the remaining steps examine whether she is disabled.

The claimant may prove this in two ways. One way—considered at step three—is to have a condition that is disabling by definition. *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1 (the "listings"). Failing this, she must present evidence of her residual functional capacity ("RFC," the most she can do despite her limitations). The ALJ determines this RFC, then at steps four and five applies this to the world of work. If the claimant's RFC forecloses her past work, and if the Commissioner cannot satisfy her burden to identify a significant number of other jobs that the claimant could learn, then the claimant is disabled.

## V.     **The ALJ's Decision**

The ALJ followed the five-step process outlined above. At steps one and two, the ALJ found that Plaintiff's claim was not clearly meritless: she had not worked since the alleged date of disability and she had severe impairments capable of lasting twelve months. These included depressive disorder, anxiety disorder, personality disorder, and borderline intellectual functioning.

However, Plaintiff could not prove she was disabled. At step three, her condition did not meet or equal a "listing." At steps four and five, her RFC and vocational profile did not foreclose meaningful work. Specifically, her RFC closely corresponded to the first hypothetical posed to the vocational expert: Plaintiff could "work at all exertional levels, performing simple and repetitive tasks without public contact." AR 25. Although this RFC foreclosed her past work, the ALJ identified a significant number of other jobs that she could learn given her age, education, and experience—namely, those described in the vocational expert's response to that hypothetical.

## VI.    **Discussion**

On appeal, Plaintiff argues that the ALJ erred in two related ways. First, Plaintiff argues that the ALJ never considered the opinion of Dr. Morris, a non-examining state agency expert, at all. In

the alternative, the ALJ rejected aspects of this opinion but failed to explain why. *See* Plaintiff's Opening Brief (doc. 20) at 6.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Id*. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Id*.

Here, the record does not include a medical source statement from a treating source despite Plaintiff's request. On May 12, 2009, Plaintiff asked Dr. Shalts to complete her disability papers, but she declined. Instead, she told Plaintiff she would "not do any papers" for her. AR 559. Nowhere in the record do Dr. Shalts or Plaintiff's therapist preclude Plaintiff from working or performing work-related activities.

The ALJ considered the opinions of consultative examiners Drs. McDonald and Hirokawa, giving "great weight" to these opinions. Dr. McDonald specifically concluded Plaintiff could work in a routine work setting. The ALJ noted that both examinations raised questions of "exaggeration and possible malingering," indications reinforced by Plaintiff's credibility issues including false denials of drug use; a repeated failure to keep mental health appointments and a failure to explain why; and daily activities inconsistent with her claimed limitations.

Dr. Morris is a nonexamining state agency expert. Nonexamining source opinions are medical opinions that the ALJ must consider and weigh. 20 C.F.R. § 404.1527(d), (f). An ALJ "may not ignore" state agency medical consultant opinions "and must explain the weight given to these opinions in their decisions." SSR 96–6p.[4] *See Shafer v. Astrue,* 518 F.3d 1067, 1069–70 (9th Cir.2008) (noting that an ALJ's silent disregard of a nonexamining physician's opinion

---

[4] Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations" and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir.1989).

8

"contravened governing regulations requiring him to ... evaluate every medical opinion received" and was legal error); *Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir.1984) (holding that the ALJ must explain why "significant probative evidence has been rejected").

### **The ALJ Did Consider Dr. Morris's Opinion**

It is true that the ALJ neither mentions Dr. Morris by name nor refers to the state agency physician, and Defendant concedes that the ALJ did not discuss every aspect of Dr. Morris's opinion. Nevertheless, Defendant argues that the ALJ actually did consider Dr. Morris's opinion. Specifically, she notes that the two opinions reach the same conclusions on the Paragraph B criteria (mild, moderate, moderate, and no instances of decompensation). Defendant argues, "The ALJ's ratings are exactly the same as those of Dr. Morris. Accordingly, it is clear that he adopted them." Defendant's opposition (doc. 23) at 5.

The Court agrees that the ALJ actually did consider Dr. Morris's opinion, but for different reasons than those offered by Defendant. Here, Defendant simply points to the common Paragraph B criteria. This is a weak basis for an inference. Paragraph B criteria are not particularly nuanced, and it would not be surprising for both Dr. Morris and the ALJ to have reached the same finding on this issue coincidentally. Instead, the Court is persuaded by the fact that the ALJ did explicitly consider another opinion (that of "the Disability Determination Services physicians") which reproduced the entire prose portion of Dr. Morris's Psychiatric Review Technique form verbatim, including its allusion to the separate MRFC form. *See* AR 28; *compare* AR 433 *with* AR 445-46. The ALJ's RFC finding also seems to draw upon parts of this opinion. Because of this, the Court infers that the ALJ did consider Dr. Morris's opinion, and proceeds to the question of whether the ALJ had sufficient basis to reject parts of it.

### **The ALJ Need Not Discuss the MRFC Checkboxes**

The Social Security Rulings state that an ALJ must "explain the weight" given to the opinions of non-examining experts. SSR 96–6p. Plaintiff argues that this requirement applies to the ALJ's rejection of each of the nine "moderate" limitations identified in Dr. Morris's MRFC form. However, the Court finds that the ALJ need not have addressed these checkboxes, because Dr.

9

1   Morris appended an explanatory statement which shows that none of these checkboxes represent
2   additional limitations. AR 434-36. As the Ninth Circuit has explained:

> The Secretary, however, need not discuss *all* evidence presented to her. Rather, she must explain why "significant probative evidence has been rejected." *Cotter v. Harris,* 642 F.2d 700, 706 (3d Cir.1981). Here, the evidence which the Secretary ignored was neither significant nor probative.

*Vincent v. Heckler,* 739 F.2d at 1395

The twenty checkboxes in the MRFC form appear under a header labeled "summary conclusions." They are further divided into four subsections: "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." Following these summary conclusions, there is another section identified as "Functional Capacity Assessment." Here the form instructs the author to "explain" these "summary conclusions in narrative form." In addition to filling out the checkboxes, Dr. Morris also filled out this explanatory section. Her narrative answer corresponded directly to the four sections of her checkbox summary conclusions, with paragraphs for "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation."

In this explanatory section, Dr. Morris characterizes each of the "moderate" limitations as either "sufficient" or "adequate." For example, after identifying "moderate" limitations in two of the items in the section relating to "understanding and memory," Dr. Morris later explains in the explanatory section on "understanding on memory" that Plaintiff has a "sufficient ability to understand and remember simple instructions." Likewise, there are three "moderate" limitations in the section relating to "sustained concentration and persistence," but these are later reflected in a narrative finding related to "sustained concentration and persistence," where Dr. Morris indicates that Plaintiff has an "adequate ability to complete simple instructions, to follow directions without additional assistance once a task is learned, and to maintain CPP [concentration, persistence, and pace] for such tasks as needed to complete a full work day/work week." Again, the three checkboxes under the "social interaction" heading are reflected in Dr. Morris's narrative finding as to "social interaction" that Plaintiff has a "sufficient ability to maintain appropriate behavior in a context of limited public contact; is capable of accepting simple instructions and responding

appropriately to feedback from supervisors." Finally, the there is a checkbox under "adaptation" stating that Plaintiff has a moderate limitation in "the ability to respond appropriately to changes in the work setting." This is explained in the "adaptation" portion of Dr. Morris's explanation giving Plaintiff a "sufficient ability ... to adequately cope with the demands of a routine work-like environment." Because Dr. Morris characterized each of the areas in the MRFC checkboxes as either "sufficient" or "adequate," these checkboxes were neither "neither significant nor probative" and the ALJ need not have discussed them.

Plaintiff further argues that Dr. Morris's additional "limitations" were specifically characterized as disabling in the vocational expert's second hypothetical, but this argument is also incorrect. The vocational expert's second hypothetical referred to a person who "cannot maintain regular attendance in the workplace" and "cannot maintain attention and concentration throughout an eight-hour workday." This directly contradicts Dr. Morris's finding that Plaintiff did not have the latter limitation: she found that she had "adequate ability ... to maintain CPP [concentration, persistence, pace] for such tasks as needed to complete a full work day/work week." AR 436.

**VII.   Conclusion**

The ALJ applied appropriate legal standards and substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby AFFIRMS the agency's denial of benefits. The Clerk of Court is directed to enter judgment for Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **November 13, 2013**              **/s/ Sandra M. Snyder**
                                         UNITED STATES MAGISTRATE JUDGE